## Chartiers Railway Company *versus* Hodgens.

1. The C. V. Railroad Company was chartered in 1853 to build a railroad from Pittsburgh to the borough of Washington. In 1856 it executed a mortgage " of all and singular the railroad of said company extending from its point of junction with the P. & S. Railroad to the borough of Washington." Under this mortgage the road was sold, and the purchasers reorganized, under the Act of April 8th 1861, as the C. Railway Company. To the stock of the company, thus organized, the defendant subscribed. The road was constructed to a point within eight miles of Pittsburgh, where it made a junction with a railroad running into said city. The terminus at Washington was a short distance outside of the borough limits, as they existed in 1853, but was within them as they existed when the mortgage was executed. Suit was brought by the company on the defendant's subscription, who refused to pay, on the ground that the railroad was not completed to the terminal points designated in its charter. *Held*, that the C. Railway Company, as purchasers under the mortgage, were not under any obligation to complete the whole road, but it was limited to the portion of the road mortgaged and sold, and as defendant had subscribed to the stock of this latter road, and not the road named in the original charter, he could not avail himself of the conditions of that charter, in regard to the terminal points, to obtain a release from his subscription.

2. To introduce a new term into a written contract, the evidence of the agreement of the parties to do so must be clear and distinct, and that the contract was executed upon the faith of such collateral agreement.

November 15th 1877. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, WOODWARD and STERRETT, JJ.

Error to the Court of Common Pleas of *Washington county :* Of October and November Term 1876, No. 264.

Assumpsit by the Chartiers Railway Company against Robert A. Hodgens, to recover an unpaid balance of $120, upon a subscription by defendant to four shares of the capital stock of said company.

The Chartiers Valley Railroad Company was incorporated by Act of Assembly, approved February 7th 1853, "with power to construct a railroad from the city of Pittsburgh, in the county of Allegheny, by the way of Canonsburg, to the borough of Washington, in Washington county." By the terms of its charter, the company was authorized "to connect its railroad at some suitable point on the Pittsburgh and Steubenville Railroad, and also to connect with the Hempfield Railroad at some point at or near the borough of Washington." By a supplement to the charter, approved April 18th 1855, the company was authorized to borrow money and to issue bonds therefor, secured by a mortgage or mortgages upon the road and franchises of the company. On the 27th of April and 26th of May 1853, the company entered into an agreement with the Pittsburgh and Steubenville Railroad Company, whereby that part of the road of the last-mentioned company, extending from Washington to Pittsburgh, was to be for the joint use of the two companies, upon the terms set forth in the agreement of lease of the dates above mentioned.

On July 1st 1856, the Chartiers Valley Railroad Company exe-

[Chartiers Railway Co. *v.* Hodgens.]

cuted and delivered to John Graham and J. Edgar Thomson, as trustees, a mortgage upon its railroad from Mansfield to Washington, and including therein all the rights and privileges secured to the company by the aforesaid agreement with the Pittsburgh and Steubenville Railroad Company, which mortgage was duly recorded in Allegheny county. The said trustees, in accordance with the provisions of the mortgage, proceeded to sell the mortgaged premises, and on the 30th of October 1866, W. J. Howard, Esq., became the purchaser, and on the 10th of December 1866, the trustees executed to him a conveyance in fee of the mortgaged estates. On January 2d 1867, pursuant to the provisions of the Act of April 8th 1861, Pamph. L. 259, a meeting of the persons for and on whose account the premises were so purchased, was held in the city of Philadelphia, and the corporation was reorganized under the name, style and title of "The Chartiers Railway Company."

The company received from the defendant, Hodgens, a subscription for four shares of stock, in the words following :—

"We, whose names are hereto subscribed, do promise to pay to the Chartiers Railway Company, the sum of fifty dollars for each and every share of the capital stock of said company set opposite our respective names, in such proportions and at such times, not exceeding five dollars per share in any period of thirty days, as shall be determined by the president and directors of said company."

Inserted on the first page of the subscription book was the following letter :—

"Pennsylvania Railroad Company, President's Office,
                "Philadelphia, October 15th 1868.
"To the President and Directors of the Chartiers Railway Company,
    "Gentlemen :—Upon your receiving the right of way and real estate free of cost to your company, and necessary for the construction and operating your railway, except depot grounds at or near the termini, and expending not less than $250,000, which sum shall be received from sales of your capital stock, in grading the same from a point on the Pittsburgh, Cincinnati and St. Louis Railway at or near Mansfield, in Allegheny county, to or near Washington borough, in Washington county, the Pennsylvania Railroad Company will purchase the first mortgage bonds of your company to an amount sufficient to enable you, with the proceeds thereof, to complete your road with single track and sidings, ready for cars and equipment.
                "Very respectfully yours,
                        "J. Edgar Thomson,
                "President Pennsylvania Railroad Co."

[Chartiers Railway Co. *v.* Hodgens.]

The Pittsburgh, Cincinnati and St. Louis Railway company, referred to in the foregoing letter, was the purchaser, at judicial sale, and succeeded to all the franchises, rights and property of the Pittsburgh and Steubenville Railroad.

The Chartiers Railway was completed from Mansfield to Washington, and at the latter place the terminus was located, on what was known as Shirl's Farm. No connection was made with the Hempfield road. The lines of the borough of Washington, as they existed in 1853, were extended in 1854, and the Chartiers Railway, while it reaches the lines as thus extended, is distant some six hundred feet from the lines as they existed in 1853.

The defendant paid eighty dollars, being the first four assessments upon his subscription.

After the completion of the road, this suit was brought to compel the payment of the remaining $120 dollars, with the statutory interest of one per centum per month for the default.

Defendant filed an affidavit of defence, wherein he averred, inter alia, that by the provisions of the charter of the plaintiff, the city of Pittsburgh was designated as one terminus of its railroad, and the borough of Washington as the other, and that the defendant, by the terms and legal effect of the contract upon which the suit is founded, engaged to pay the sum therein mentioned only upon condition that the said plaintiff would in good faith construct its road to the terminal points designated. The said railroad company, while claiming to have completed its road, has not extended it to either of the terminal points aforesaid, but has terminated it on the north, at the town of Mansfield, some eight miles distant from the city of Pittsburgh, and has finally abandoned the construction of its road in the direction of the said city, and on the south, at the Cumberland road, on the farm of Catharine Shirls, two thousand feet, or thereabouts, distant from the terminus fixed by its charter, and contemplated and required by the contract between it and this defendant, and has there erected passenger and freight depots, engine-house, and other buildings necessary for the accommodation of its business, starts and stops all its trains, and receives and delivers all its freight at the said point, and so has continued to do since the opening of its road, and has definitely fixed and determined the same as the southern terminus of the same; and that the plaintiff, not having complied with the conditions of the contract, the defendant was released from the terms of his subscription.

Upon the filing of this affidavit of defence, the plaintiff took a rule for judgment, on the ground of its insufficiency. This rule the court below dismissed, and on appeal this court, SHARSWOOD, J., and GORDON, J., dissenting, affirmed this decision (see 27 P. F. Smith 191), and sent the case back " to be tried precisely as it would have been if no writ of error had been taken."

At the trial the defendant offered to prove that when his sub-

scription was made, as an inducement, it was represented that the Chartiers Railroad would be constructed to a point of connection with the Hempfield road; and further, that many persons who had made their subscriptions upon the faith of this connection, having become alarmed lest it would not be made, expressed their apprehensions to the officers of the road, from whom they received assurances that it was the purpose of the road to extend its line to the Hempfield road, and make connection with it.

These offers, under objection, were admitted.

In their general charge, the court, Acheson, P. J., said:—

"By the act of incorporation, the city of Pittsburgh was designated as one terminus, and the borough of Washington as the other terminus of the plaintiff's road.    These terminal points formed part of the conditions which entered into the contract made between the company and the defendant.    The company was bound to construct its road from and to these points, and an abandonment of either would be illegal abuse of the authority delegated to the company, for which it would be responsible to the defendant as well as to the state."

Verdict for the defendant, and among the errors assigned by plaintiff, which took this writ, were the admission of the foregoing evidence and the portion of the charge noted.

*Hampton & Dalzell* and *A. M. Todd*, for plaintiff in error.— The Chartiers Valley Railroad and the Chartiers Railway Company were not identical.    The functions of the latter were only such as attached to them as purchasers at judicial sale upon the foreclosure of the mortgage given by the former.    The evidence admitted should have been rejected : Cass *v.* The Pittsburgh, Virginia and Charleston Railroad Company ; Custar *v.* Titusville Gas and Water Company, 13 P. F. Smith 381.

*Braden & Miller*, for defendant in error.—A subscription to stock is a contract between the subscriber and the company, governed by the same rules of honesty in its enforcement that apply to ordinary contracts : Custer *v.* Titusville Gas and Water Company, 13 P. F. Smith 381 ; Railroad Company *v.* Byers, 8 Casey 22.    Such a contract is necessarily impregnated with the description of the enterprise given in the charter ; for the very object of the subscription is to furnish aid to that particular work.

It is involved in the nature of a subscription to the stock of a company for making a road from one place to another, that the termini are part of the contract: Plankroad Company *v.* Arndt, 7 Casey 317.

The motive and the consideration for the subscriptions were withdrawn or changed by the alteration of the terminus of the road : Commonwealth *ex rel.* Reinboth *v.* Pittsburgh, 5 Wright 282; Everhart *v.* Philadelphia and West Chester Railroad Company, 4

Casey 339; Gallagher *v.* Fayette County Railroad, 2 Wright 102; Carey *v.* Philadelphia and Chester County Railroad, 30 P. F. Smith 363.

Mr. Justice SHARSWOOD delivered the opinion of the court, January 7th 1878.

It will be entirely unnecessary to consider the numerous assignments of error in this case, as there is one point which is decisive of the whole controversy, upon which the judgment must be reversed.

The Chartiers Valley Railroad Company was incorporated by an Act of Assembly, approved February 7th 1853, Pamph. L. 42, " with power to construct a railroad from the city of Pittsburgh, in the county of Allegheny, by way of Canonsburg, to the borough of Washington, in Washington county."

Had the defendant been sued upon a subscription to the stock of this company, it may be that these terminal points were fundamental conditions of the contract, and an abandonment of them and the adoption of others short of them by the corporation, would have released the defendant from his subscription. Upon that question we express now no opinion.

The Chartiers Valley Railroad Company, on the 1st day of January 1856, executed a mortgage to J. Edgar Thomson and John Graham, of " all and singular the railroad of said company extending from its point of junction with the Pittsburgh and Steubenville Railroad, in the county and state aforesaid, to the borough of Washington, and state aforesaid, with all the privileges and appurtenances, estate real and personal, rights, liberties and franchises, whatsoever and wheresoever thereunto belonging, and also of all the rights, liberties, privileges, benefits and emoluments secured to the said company by certain articles of agreement between them and the Pittsburgh and Steubenville Railroad Company, dated April 27th and May 26th 1853." Under a power of sale contained in this mortgage, the railroad thus described was sold to William J. Howard, and the same was duly conveyed to him. He proceeded, under the Acts of Assembly, to organize a corporation under the name of The Chartiers Railway Company. It was to the stock of this last-named corporation that the defendant below was a subscriber. The contract of subscription was a simple, unconditional one, with no description of route or termini. The articles of agreement with the Steubenville and Pittsburgh Railroad Company, referred to in the mortgage, secured to the Chartiers Valley Railroad Company the use of that part of the Pittsburgh and Steubenville Railroad " from a suitable point of junction at or near Mansfield to the south side of the Monongahela river opposite Pittsburgh, so constructed as to accommodate the business of both companies." It is to be remarked also, that while, in 1853, the railroad stopped short of the limits of the borough of Wash-

ington, yet on the 10th of June 1854, before the execution of the mortgage, the limits of the borough were extended, and the railroad does reach the borough thus enlarged.

It seems to us that it is very clear that the termini of the railroad of the Chartiers Railway Company, under the mortgage and charter based on the sale thereunder, were at the one end the borough of Washington, according to its limits as it existed at the date of the mortgage, and at or near Mansfield at the other end. If this view needed confirmation it will be found in the letter of J. Edgar Thomson, President of the Pennsylvania Railroad Company, dated October 15th 1868, to the president and directors of the Chartiers Railway Company, containing the offer upon the faith of which the issue of five thousand shares of capital stock was authorized, to four shares of which the defendant below subscribed. It states the road to be "from a point at or near Mansfield in Allegheny county to or near Washington borough in Washington."

Nor do the provisions of the Act of' April 8th 1861, Pamph. L. 259, entitled, "An Act concerning the sale of railroads, canals, turnpikes, bridges and plank-roads," interfere with the view which we take of this case. The Chartiers Valley Railroad Company possessed the franchise of making a road to Pittsburgh and to the original bounds of Washington borough, and let it be conceded that as to the subscribers to the stock of that company, they were bound to exercise that franchise. But it does not follow that they were compelled to include that franchise in their mortgage, and that the purchasers would come under any obligation to complete the whole road. The Act of Assembly is silent on the subject. It provides, indeed, that the purchasers shall be invested with all the rights and franchises of the corporation as whose the railroad may have been sold, but surely this must be limited to so much of the road as has been mortgaged and sold. If they could mortgage the whole they could also a part, and the rights and franchises of the purchasers cannot extend higher or reach further than the mortgage upon which their title rests.

We think also that there was error in receiving and submitting to the jury the evidence offered and given in regard to representations made by those employed to solicit subscriptions as to the connection to be formed with the Hempfield road. Laying aside altogether the question of the sufficiency of the evidence of their authority to bind the company by any such condition to be annexed to the contract, the representations relied on amounted to mere declarations of intention and for all that appears perfectly honest when made. The cases all concur in the doctrine that to introduce a new term into a written contract, the evidence of the agreement of the parties to do so must be clear and distinct, and that the contract was executed upon the faith of such collateral agreement. But the evidence fell far short of this requirement. Take the

[Chartiers Railway Co. v. Hodgens.]

defendant's own testimony upon the subject: "Joshua Wright and John McElroy presented the book to me for my subscription. There was considerable talk at the time; I cannot give their language; the substance of what they said was that there would be a connection between the Chartiers and Hempfield Railroad. * * * I cannot say that their conversation was the only inducement. Their conversation made me conclude there would be a connection between the roads. They so represented to me that there would be a connection between the roads, that I had no doubt of it. *There was no positive arrangement.* They assured me that the connection would be made. I thought the assurance had been given them that the connection would be made. I did not investigate whether they had authority to make the connection." What would any written contract be worth if such loose testimony is permitted to go to a jury in order to reform the instrument by introducing a new term or condition? The subscriber to the stock of a corporation has a plain chart before him. If he insists on conditions not contained in the subscription paper, he can insert them over his name. The company can then know whether to accept or refuse the subscription with such conditions. The defendant understood this, for having first put his name to a special subscription on the express condition that the road should be located and constructed upon a line connecting the same with the Hempfield railroad, that subscription was erased and the unconditional one substituted. Yet it was submitted to the jury to say whether the new subscription was not made on the same terms as the old; and the learned judge instructed the jury that it mattered not whether the agents who made the representations relied on were or were not authorized to make conditions with the subscribers. The case of The Railroad Company v. Stewart, 5 Wright 159, which he cites, was a case in which there was no question as to the authority to accept the special subscription. It was the act of the president of the company.

It is undoubtedly true that fraudulent misrepresentations of an unauthorized agent will infect the contract; for the principal cannot avail himself of a contract so made. But there was in this case no evidence of fraud. There were declarations of intentions to do what they honestly intended to do, and no doubt if they had the ability they would have done; and the defendant could not have regarded them in any other light.

We think also that the evidence of ratification by the company was insufficient to submit to the jury. It was of the same character as all the rest—recognition of the fact that it had been the intention of the company to connect its road with the Hempfield, and still was. There was nothing in all of it like the acknowledgment of a subsisting condition.

Judgment reversed and *venire facias de novo* awarded.